**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

**ELIZABETH R. LITTLE,**

     **Plaintiff,**

**v.**                            **Case No. 5:12cv225/CJK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

     **Defendant.**

_____/

## MEMORANDUM ORDER

This matter is before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83. Ms. Little will be referred to by name, as claimant, or as plaintiff. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and FEDERAL RULE OF CIVIL PROCEDURE 73 for all proceedings in this case, including entry of final judgment. T. 11-1.

Upon review of the record, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner, therefore, will be affirmed, and the application for benefits will be denied.

## PROCEDURAL HISTORY

Ms. Little applied for Title XVI Supplemental Security Income on February 20, 2009, alleging disability beginning on that date.[1]  T.12.  Ms. Little's claim initially was denied and, upon reconsideration, the denial was upheld.  Claimant filed a written request for a hearing on September 23, 2009, which was granted. T. 12.

Ms. Little testified at an administrative hearing, which took place on February 7, 2011, in Panama City, Florida.  An impartial vocational expert also testified at the hearing.  The Administrative Law Judge (ALJ) upheld the denial of Ms. Little's claim, finding that she had not been disabled, as defined by the Act, since the date of the application.  Claimant filed a Request for Review of Hearing Decision on April 14, 2011, which was denied by the Appeals Council of the Social Security Administration on May 18, 2009. T. 1-5.  In response, claimant brought this action against Michael J. Astrue, the Commissioner of Social Security, on July 17, 2012.

## FINDINGS OF THE ALJ

In the written decision, the ALJ made a number of findings (numbered as in the ALJ's order) relative to the issues raised in this appeal:

2.     The claimant has the following severe impairments: mild chronic obstructive pulmonary disease by history, depressive disorder, borderline personality disorder, substance addiction disorder by history.

4.     The claimant has the residual functional capacity (RFC) to perform a range of light work as defined in 20 CFR 416.967(b).  The claimant can lift and/or carry up to

---

[1]The administrative record, as filed by the Commissioner, consists of multiple volumes (docs. 10-1  through10-8) and has 410 consecutively numbered pages.  References to the record will be by "T.", for transcript, followed by the page number.

Case No. 5:12cv225/CJK

20 pounds occasionally and 10 pounds frequently. She can sit, stand, and/or walk for about six hours each, with normal breaks, in an eight-hour workday. The claimant has no postural limitations. The claimant is limited to work not requiring fine visual acuity without best correction. She must avoid moderate exposure to dust, fumes, and gasses. The claimant is limited to work not requiring a good reading ability. The claimant is limited to work not requiring more than brief, superficial contact with coworkers and supervisors. The claimant is further limited to work not requiring a consistent/fast pace or without sufficient rest periods throughout the workday.

5.    The claimant is capable of performing past relevant work as a cashier II. This work does not require a performance of work related activities precluded by the claimant's RFC.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at 1439). Although the

Case No. 5:12cv225/CJK

ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Thus, although review is deferential, the reviewing court conducts "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[2]

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

Case No. 5:12cv225/CJK

substantial gainful work which exists in the national economy." *Id*. at § 1382c(a)(3)(B). Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 416.912. The Eleventh Circuit has explained the operation of step five. *See Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001) ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the

capacity to perform. In order to be considered disabled, the claimant must then prove that she is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts and is not specifically provided for in the statutes or regulations. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ('The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act')).").

Step five (or step four in cases, such as the present one, where the ALJ decides a claimant can perform her past work) is where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Based on the residual functional capacity, the ALJ makes the ultimate vocational determination required by step four or five.[3] "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[4] 20 CFR § 416.945. Often, both the medical evidence and the accuracy

---

[3] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20 C.F.R. § 416.920.

[4] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity.
> We will assess your residual functional capacity based on all of
> the relevant medical and other evidence. In general, you are
> responsible for providing the evidence we will use to make a

of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by many disappointed claimants.

## FACT BACKGROUND AND MEDICAL HISTORY

At the hearing, Ms. Little testified that she was born on July 10, 1968, and was forty-two years old.[1]  T. 28.  During the past fifteen years, she worked as a certified nursing assistant (CNA) and cashier.  T. 30.  Claimant explained that she did not believe she could return to work because she did not get along with other people and would "snap all the time at them."  T. 32.  She purportedly suffers from depression and crying spells two to three times a week and has frequent panic attacks.  In addition, she claims to have breathing problems and to suffer from auditory hallucinations three to four times a week.[2]  T. 33-35.  Ms. Little takes Paxil and

---

finding about your residual functional capacity.  (See § 416.912(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 416.912(d) through (e).)  We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 416.913.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

[1] The court's recitation of the facts and medical history is based on its independent review of the record.  *See Tieniber*, 720 F.2d 1251 (11th Cir. 1983).

[2] Claimant acknowledged that she smokes half a pack of cigarettes a day.

Haldol for her depression, panic attacks, and hallucinations, which she claims make her drowsy. T. 39. She denied watching television, allegedly because it is distracting and causes her to lose focus.[1] T. 35. She also reported being able to do some housework, including laundry, cooking, and the dishes. T. 38, 44. She testified that she cannot lift more than five to ten pounds because of a wrist injury. T. 45.

Robert Strader, a vocational expert (VE), reviewed the claimant's medical records and testified at the hearing. T. 47-51. The VE explained that cashier II work typically is unskilled light work, although claimant's characterization of the duties she performed justified a classification of medium work. T. 48. When asked to consider the plaintiff's background, characterization, and restrictions, the VE testified that the claimant could perform her past work as cashier II as generally performed in the national economy. T. 49. The ALJ asked the VE to take into account the following moderate mental restrictions: performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances, completing a normal work day without interruption from psychologically based symptoms, performing at a consistent pace without unreasonable number and length of rest periods, accepting instruction and responding appropriately to criticism from superiors, and getting along with coworkers or peers without distracting them or exhibiting extreme behavior. T. 50. The VE testified that, even with those restrictions, Ms. Little could perform her past work as cashier II as generally performed in the national economy.[8] T. 50.

---

[1] She later admitted to being able to watch television for thirty minutes at a time. T. 43.

[8] In response to the VE's testimony, claimant's representative asked only for clarification of the kind of breaks such a job would entail. T. 48-51.

Case No. 5:12cv225/CJK

According to the record, Ms. Little first sought medical attention for her psychiatric problems in November 1992, when she was admitted to Bay Medical Center. T. 190. Upon admission, claimant stated that she was suffering from depression and suicidal ideations stemming from an "ugly" divorce. T. 190. Terry Moore, D.O., diagnosed claimant with adjustment disorder with mixed emotional features, ruled out personality disorder NOS, and assigned claimant a Global Assessment of Functioning (GAF) of 60.[1] T. 191. Upon discharge, Dr. Moore noted that claimant's affect was normal and that she was experiencing no hallucinations or delusions. T. 190-191. He thus discharged her without medication. T. 191.

Ms. Little next received medical treatment on August 2001, when she attended a month-long chemical and alcohol addiction program. Ms. Little reported one relapse after leaving the program, and the record demonstrates that she entered a detox program in June 2003. T. 201. After she was released from the detox program, Ms. Little continued with counseling and was progressing well through 2005.[10] Then, in December 2006, she sought treatment at Life Management Center. T. 229. In her initial intake form, Ms. Little stated that she was suffering from depression, sleep disturbances, irrational thoughts and behaviors, and an inability to maintain

---

[1]Formerly, a GAF between 51 and 60 was considered to indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning. The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). The most recent edition of the Diagnostic and Statistical Manual, however, no longer recommends the use of the GAF scale, noting that "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). Because the claimant did not rely on her GAF in support of her claim, the court will not address it further.

[10] However, Ms. Little missed four counseling sessions that year. When she did attend a session, the counselor noted that she was cooperative and progressing well. T. 200-208.

employment due to anger outbursts.  T. 229.  Counselor Lisa Baldwin noted likely diagnoses of bipolar disorder with psychotic features and alcohol dependence.  T. 229.  Interestingly, Ms. Little indicated to Baldwin the she was interested in psychiatric services only to the extent they might help her obtain disability benefits. T. 234.

Claimant underwent a psychological evaluation in February 2007 by George Horvat, a licensed psychologist, upon referral by the Florida Department of Health, Disability Division (FDOH), for purposes of determining her mental status.  T.237. At that time, claimant complained primarily of problems interacting with other people.  T. 238.  Dr. Horvat diagnosed her with bipolar II depressed type, delusional disorder paranoid type, and borderline intellectual functioning; he noted, however, that if claimant were able to function with medication, no psychological reasons would prevent her from returning to work.  T. 240.  Claimant saw Dr. Horvat again in April 2008, complaining of panic attacks which she attributed to physical abuse she suffered in the past, both as an adult and child.  T. 248.  On her intake form, claimant indicated that she had been diagnosed with chronic obstructive pulmonary disease (COPD); she also reported that she was having auditory and visual hallucinations, suffering from paranoia, and binge drinking.  T. 248.  Dr. Horvat noted that claimant previously had been prescribed Amitaptyline, Wellbutrin, and Premarin, but was not taking them for financial reasons.  T. 248.  Dr. Horvat's diagnosis of the claimant remained largely the same, and he again noted that if she could be stabilized with medication, there would be no psychological reasons she could not return to work.  T. 250.

One week after her visit with Dr. Horvat, Ms. Little returned to the Life Management Center for a consultation with Lisa Baldwin. T. 259. Baldwin indicated that Ms. Little presented with symptoms of mania consistent with her bipolar diagnosis. T. 259. According to Baldwin, Ms. Little stated that, four months before her visit, during a three-day manic episode, she took four or five Tylenol PM to fall asleep. T. 259. She also admitted to smoking one pack of cigarettes a day but denied drinking alcohol for the past two years. T. 259. Ms. Little reported that she suffered from serious mood fluctuations and auditory/visual hallucinations. T. 260. Based on her examination of Ms. Little, Baldwin concluded that Ms. Little had slightly impaired remote memory and general intelligence. T. 262. Baldwin also noted marked impairment in Ms. Little's abstract thinking and ability to manage daily living, as well as in her ability to make reasonable life decisions. T. 262. Baldwin confirmed most of Dr. Horvat's diagnoses and recommended therapy and psychological services for Ms. Little. T. 264-65. The next day, Ms. Little met with Stanford Williamson, D.O., for a Social Security Disability examination. T. 252. She mentioned to Dr. Williamson that she had difficulty getting along with other people and was easily annoyed. She reported shortness of breath, fast heartbeat, and tightness in her chest; a respiratory inspection, however, showed no wheezing and unlabored breathing. T. 253. Dr. Williamson diagnosed Ms. Little with social anxiety disorder. T. 254.

In October 2008, claimant saw Nancy Gibson, a nurse practitioner at Life Management Center, for a medication refill. T. 268. At that time, claimant reported feeling anxious. Nurse Gibson confirmed the previous diagnoses and recommended a follow-up visit in three months. T. 269. Claimant returned to Life Management

Center again in 2009, at which time she reported that she recently had been "kicked out" of the home in which she had been living, which belonged to her boyfriend's sister. T. 266. She admitted to drinking one beer earlier in the week and stated that she had become intoxicated only once since October 2008. T. 266. She also indicated that she was running out of Paxil and had been spacing out her doses. T. 266. Nurse Gibbons' diagnoses of the claimant remained largely the same, although she prescribed her Haldol, Cogentin, and Paxil and requested that claimant return in three months or sooner if any problems developed. T. 267.

On February 20, 2009, shortly after her visit with Nurse Gibbons, Ms. Little filed a claim for disability benefits, alleging disability as of that date based on bipolar disorder and COPD. Sam Banner, M.D., evaluated Ms. Little in April 2009, at the request of FDOH. T. 276. During her visit with Dr. Banner, Ms. Little reported chronic shortness of breath and fatigue upon physical activity; she also admitted to having smoked a pack of cigarettes a day for the past twenty years.[11] T. 276. She complained of difficulty getting along with others and frequent anxiety. T. 276. Dr. Banner's examination of Ms. Little revealed symptoms of chronic upper abdominal distension and a prolonged expiratory phase.[12] T. 277. He also noted that her uncorrected vision was 20/70 far and 20/100 near. T. 277. Dr. Banner diagnosed Ms. Little with COPD and bipolar/manic depressive disorder and indicated that she would need long-term medical and psychiatric care. T. 279.

---

[11] She denied drinking alcohol.

[12] According to pulmonary function studies performed at Dr. Banner's request, Ms. Little had "mild restrictive pattern indicated by mild reduction in forced vital capacity with preservation of FEV1/FVCA." T. 280.

Case No. 5:12cv225/CJK

Claimant also was evaluated by Dr. Horvat in April 2009 at the request of FDOH. T. 292. She reported to Dr. Horvat that she had a panic attack the previous day; she also reported spontaneous crying approximately twice a week and a dislike of crowds and interaction with people.[13] T. 292. She denied alcohol use over the past two years but said she had difficulty sleeping and a poor appetite. T. 292. Dr. Horvat noted that while Ms. Little's eye contact was normal, her facial expression was depressed; he also observed that her mood and affect were depressed but that she showed no signs of preoccupations or hallucinations and that her organization was goal directed. T. 292. Dr. Horvat opined, based on verbal and math skills demonstrated during the interview, that Ms. Little was of below average intelligence. T. 292. His diagnoses remained the same and he reiterated that, as long as she had no physical restrictions, claimant could return to work while continuing to receive psychological treatment. T. 293.

Claimant returned for a checkup with Nurse Gibson the following month and reported that she was "doing quite well" except for some trouble sleeping due to increased stress about her daughters and grandchildren. T. 356. She denied drug or alcohol use. T. 356. Nurse Gibson repeated her previous diagnoses and refilled claimant's prescriptions for Haldol, Cogentin and Paxil. T. 357. She also suggested a follow-up visit in three months or sooner if any problems developed. T. 357. Later that month, claimant underwent a physical RFC assessment by Thomas Peele, M.D., who found that she had the ability to occasionally lift twenty pounds and frequently lift ten pounds, stand and/or walk with normal breaks for a total of approximately six hours in an eight-hour work day, and unlimited pushing/pulling abilities other than

---

[13] She denied a history of hallucinations. T. 292.

Case No. 5:12cv225/CJK

as shown for "lift/carry." T. 295. He found no postural or manipulative limitations but noted visual limitation in the form of limited near/far acuity.[14] T. 297. In rendering his assessment, Dr. Peele took into account Ms. Little's history of COPD, including the recent pulmonary studies. T. 295. Perhaps for that reason, he recommended that claimant avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. T. 298.

Ms. Little underwent a mental RFC assessment in June 2009 by Jeffrey Benoit, Ph.D., a state agency psychologist who concluded that claimant was "not significantly limited" in most areas of mental work functioning, including understanding and memory, sustained concentration and persistence, and social interaction and adaptation. T. 302. Dr. Benoit found, however, that Ms. Little was "moderately limited" with regard to understanding and remembering detailed instructions, sustaining an ordinary routine without special supervision, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism, and traveling in unfamiliar places. He concluded that claimant would do best in an environment in which she did not have to process or act upon complex information and could work under a supervisor who recognized her intellectual limitations and was not hypercritical. T. 302-304

The following month, Sean Fitzgerald, M.D., a state agency physician, conducted another physical RFC assessment of Ms. Little, finding that her restrictions were largely the same as observed during her first physical RFC assessment. Like Dr. Peele, Dr. Fitzgerald recommended that claimant avoid even moderate exposure to

---

[14] Specifically, Dr. Peele recorded Ms. Little's eyesight capabilities as "limited to frequent use," with 20/100 vision in her right eye and 20/50 vision in her left eye when uncorrected. T. 297.

fumes, odors, dusts, gases, and poor ventilation. T. 325-328. Ms. Little also underwent a second mental RFC assessment – by Dr. James Mendelson, Ph.D, a state agency psychologist. Similar to the previous mental assessment, Dr. Mendelson noted that claimant was "not significantly limited" in most areas of mental activity but found her "moderately limited" with regard to performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances, completing normal work days and work weeks without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers and peers without distracting them or exhibiting behavioral extremes. T. 346-347. Dr. Mendelson questioned claimant's previous diagnoses, including her diagnoses of bipolar disorder and delusional disorder and noted that many of Ms. Little's symptoms were characteristic of less severe conditions and may have been influenced by substance abuse. T. 348. Dr. Mendelson diagnosed claimant with mixed personality disorder with borderline and histrionic features and indicated that she had responded well to treatment and showed only a few symptoms of a mental disorder, none of which were disabling. T. 348. Accordingly, Dr. Mendelson concluded that while claimant was "tense, dysphoric and socially withdrawn, there [were] no significant restrictions in the functional capacity to engage in a full range of routine day to day behaviors." T. 348.

After her second round of RFC assessments, Ms. Little returned to Life Management Center in August 2009 for a follow-up visit with nurse practitioner Jerris Grover. T. 354. At the time of her visit, claimant had been without her

medication for three days and stated that she did not feel any difference.[15]  Her family thought she was depressed and not doing well on her medications, but she denied suicidal ideation and hallucinations and reported that she was abstaining from alcohol and "doing okay."  Nurse Grover indicated that the Haldol was controlling claimant's psychotic symptoms and thus continued her prescription; he also continued her prescriptions for Congentin and Paxil and added Wellbutrin.   Finally, he recommended that Ms. Little follow up in one month so he could determine whether she had on any side effects from the Wellbutrin.  T. 344-55.  Rather than return to the Life Management Center as recommended, Ms. Little sought treatment at Southeast Alabama Medical Center in October 2009 for an "adjustment of medication."  T. 365.  She was admitted for five days.  T. 365.  According to the record, she was hyperverbal at the time of admission and complained of paranoia and auditory/visual hallucinations that had been increasing in frequency over the past few weeks.  T. 366.  She also reported that she separated from her husband two months ago but was still living in the same house with him.  She denied suicidal thoughts but indicated that she was not sleeping well and was irritable and easily distracted.  T. 366.  She had ceased taking Wellbutrin because she believed it was causing diarrhea.  T. 366.  She admitted to smoking one pack of cigarettes a day and drinking alcohol.   The examining doctor, Shabana Jaffri, noted that pulmonary function was labored but that breath sounds were clear.  T. 370.  Dr. Shabana prescribed Paxil and Seroquel and increased claimant's dosage of Haldol.  T. 367, 397.

After Ms. Little was released from Southwest Alabama Medical Center, she returned to the Life Management Center for evaluation and assistance with her

---

[15] Ms. Little missed a previous appointment, which caused her to run out of medication.

medication. T. 397. Although she denied having hallucinations, Nurse Grover noted that claimant was hypomanic and had mildly pressured speech. T. 397. Because Ms. Little was having trouble affording the new medication that had ben prescribed for her, Nurse Grover discontinued her Seroquel and advised her to return for a follow-up visit in one week. T. 397-98. Claimant returned the following week, at which time she was doing "quite well" and had no complaints. T. 395. She indicated that her mood was stable and that she was not having any hallucinations; she also denied suicidal ideation. T. 395. Nurse Grover thus recommended a follow-up visit in three months. T. 396. Claimant returned to Life Management Center in December 2009. T. 393. Nurse Grover again noted that Ms. Little was doing "really well" and that her mood was stable. T. 393. Both claimant and her husband reported that the Haldol was "making [the claimant] raw feeling when tired," so Nurse Grover reduced the dosage. T. 393. Ms. Little denied any substance abuse but admitted to smoking cigarettes. T. 393.

Claimant next visited to Life Management Center in January 2010, at which time Nurse Grover concluded that the episode that led to claimant seeking treatment at Southeast Alabama Medical Center was either alcohol induced or an aberrant episode of instability. T. 391. Nurse Grover adjusted the claimant's Haldol prescription and enrolled her in the Patient Assistant Program for Depakote. T. 391. Although claimant was having issues with psychomotor slowing and sleeping too much, her mood was stable and she was not having psychotic symptoms. T. 391. She again denied substance abuse and suicidal ideation. T. 391. Nurse Grover diagnosed claimant with schizoaffective disorder, psychotic disorder with hallucinations, alcohol induced mood disorder, and personality disorder NOS with borderline

features.  T. 391.

Claimant next visited the Life Management Center in February 2010 for a follow-up visit.  T. 389.  Nurse Grover noted on that date that Ms. Little seemed "much brighter" and more alert.  T. 389.  She apparently was not as sedated as she had been at the previous appointment.  T. 389.  Claimant stated that she was tired and suffered from a lack of motivation, but was doing more.  T. 389.  She did not have any psychotic symptoms and her mood was stable.  T. 389.  Her main complaint was lateral jaw movements, which Nurse Grover believed was a side effect of the Depakote or Haldol.  T. 389  Nurse Grover thus increased claimant's dosage of Congentin and reduced her dosage of Haldol.  T. 389.  Claimant missed her next two appointments with Nurse Grover and did not see him again until her most recent appointment in April 2010, when she reported concern over teeth grinding, anxiety, and itching due to medications.  T. 387.  Nurse Grover noted that Ms. Little's  mood was stable and she was having no hallucinations but was consuming alcohol, from which Nurse Grover advised her to abstain.  T. 387.  He also discontinued claimant's prescriptions for Depakote and Haldol and prescribed Atarax to help with the anxiety and itching.  T. 387.

## ANALYSIS

Based on the testimony of the vocational expert and claimant's medical history, the ALJ determined that Ms. Little had the RFC to perform her previous light work as a cashier.  T. 18.  Ms. Little challenges the ALJ's decision in that regard, arguing that "the RFC does not accurately reflect her limitations and . . . is so vague that it is impossible to determine the ALJ's intended limitations."  Ms. Little's first argument – that the RFC does not accurately reflect her limitations – is conclusory and

unsupported. Indeed, Ms. Little points to no evidence, medical or otherwise, to contradict the ALJ's finding. Nor does she offer any limitations the ALJ should have included in his assessment but overlooked. It is well established that "[t]he claimant has the burden of proving [she] is disabled, and is therefore responsible for producing evidence in support of the claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); 20 C.F.R. § 416.912(a), (c). Not only did the claimant fail to meet her burden in that regard, but the ALJ's finding is supported by the record.

Claimant's second argument – that the RFC is overly vague – likewise lacks legal and evidentiary support. Ms. Little has not presented a single analogous RFC that has been ruled overly vague, and although she has identified two phrases she contends are vague, I find both phrases to be sufficiently clear. The first phrase to which claimant objects is "limited to work not requiring fine visual acuity without best correction." Notably, the ALJ used a similar phrase during the hearing while posing a hypothetical question to a vocational expert, and claimant's counsel neither objected to nor sought clarification of the phrase. Moreover, while the phrase may not be a model of clarity, a lay person should be able to discern that it refers to limitations on the claimant's vision when uncorrected.[16] With regard to the second phrase, "limited to work not requiring a consistent/fast pace or without sufficient rest periods throughout the workday," a lay person should have little difficulty interpreting it as restricting the claimant to work that does not require a fast pace and allows for periods of rest. And the claimant has offered no basis for interpreting it otherwise. Even if the court somehow found these phrases vague, "[it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

---

[16] The claimant, however, is represented by counsel in this matter.

Case No. 5:12cv225/CJK

*Dixon v. Astrue*, 312. F. App'x 226, 229 (11th Cir. 2009). I find the ALJ's decision easily decipherable in this case – that Ms. Little cannot perform a job that requires perfect eyesight and cannot engage in strenuous work without sufficient breaks.

Claimant further contends that "the RFC is irrational and [that] it is impossible to defend or respond appropriately to such restrictions as [limited to] fine visual acuity without best correction." Ms. Little, however, offered no evidence that she was incapable of performing jobs that do not require perfect eyesight. As such, this contention also fails. Finally, claimant seems to argue that when nonexertional impairments significantly affect the occupational base, a finding of disability is warranted. Curiously, however, Ms. Little did not present any evidence that her impairments significantly affected her occupational base. This argument thus likewise lacks merit.

In sum, claimant has presented no evidence to support her claims that the ALJ's RFC was incorrect and vague. Based on the testimony of the vocational expert and Ms. Little's medical history, I find substantial support in the regard for the ALJ's finding that claimant had the RFC to perform her previous light work as a cashier and thus find the ALJ's decision to be in compliance with the appropriate legal standards. *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

Case No. 5:12cv225/CJK

Accordingly it is ORDERED:

1.  The application for a period of disability and disability benefits is DENIED and the Commissioner's decision is AFFIRMED.

2.    The clerk will issue final judgment.

At Pensacola, Florida, this 18th day of July, 2013.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**